**UNITED STATES FIRE INSURANCE COMPANY**

v.

**ROYAL INSURANCE COMPANY, Appellant.**

No. 84–1379.

United States Court of Appeals, Third Circuit.

Argued Feb. 7, 1985.

Decided April 16, 1985.

Rehearing Denied May 13, 1985.

**307**

Stephen A. Cozen (Argued), Jeanne P. Wrobleski, Cozen, Begier & O'Connor, Philadelphia, Pa., for appellant.

Joseph P. Selfridge (Argued), James J. McEldrew, McEldrew, Hanamirian, Quinn & Scace, Philadelphia, Pa., for appellee.

Before GARTH, BECKER and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This is a case of considerable importance because of the questions it poses with respect to the operations of the liability insurance industry of this country. It explores for the first time by this court the question of the duty owed by a primary insurance carrier under Pennsylvania law to an excess carrier. It also raises the question of whether the primary carrier acted in bad faith by refusing to tender its policy limits in an attempt to achieve a settlement when a "high-low" settlement approved by both was reached; where both the primary and excess carriers agreed that there was a substantial chance of winning the underlying litigation; and where neither the plaintiff nor the insured itself demanded that the primary carrier settle within the policy limits.

United States Fire Insurance Co. (Fire), the excess carrier, won a verdict in the United States District Court for the Eastern District of Pennsylvania against Royal Insurance Company (Royal), in which a jury found that Royal acted in bad faith in refusing to tender its policy limits during the defense of a prior products liability action. The court had denied Royal's prior motions for a directed verdict and entered judgment on the verdict. Royal appeals and we reverse.

### I.

On December 31, 1977, a fire damaged a food plant in Philadelphia owned by Ready Food Products, Inc. (Ready Foods). Ready Foods, one of its employees, and the Ex-Cell-O Corporation brought a products liability suit for damages resulting from the fire against the Nordson Corporation (Nordson), the manufacturer of a solvent which allegedly caused the fire. Nordson carried liability insurance with two separate carriers: Royal, the primary carrier, insured Nordson in the amount of $250,000 and Fire, as Nordson's excess carrier, provided insurance in the amount of $5,000,000.

When the claims against Nordson arose in 1978, Royal retained David Steck as counsel. Fire's claims supervisors became involved in the case in January 1980 and Fire's attorney, Paul Bechtel, entered the case the following December. Royal's counsel conducted the pre-trial preparation and trial proceedings in collaboration with Bechtel, and it is undisputed that Steck performed in a competent and satisfactory manner.

Trial in the *Nordson* litigation began on May 4, 1981. On that day, the plaintiffs offered to settle the case for $1,200,000. Both carriers agreed that the offer should be rejected out of hand. Royal rejected the offer and made a counter-offer of $75,000–$80,000, which the plaintiffs in turn refused.

The trial judge next advised Steck and Bechtel that $800,000 would settle the case, the attorneys for the plaintiffs in the *Nordson* case, having been authorized to accept $800,000. Again, both carriers concluded that this offer should also be rejected and neither Royal nor Fire responded to it. By the time the plaintiff's case was concluded, it seemed to both Bechtel and Steck that the defense was going very well. Bechtel advised his client, Fire, that in his estimation the defendants had an eighty percent chance of winning the case. Based on their estimation of the weakness of plaintiff's case, Steck and Bechtel decided not to call any witnesses for the defense.

On May 11, after the close of the evidence, the trial judge informed counsel for Royal and Fire that he had the "impression" that $400,000 would settle the case. Bechtel later testified in these proceedings that he too suspected that $400,000 would have settled the case, but he could not recall the source of his belief. In any event, he communicated his "suspicion" to Fire's home office. Fire's claims supervisor in turn informed his superior that plaintiffs had made a demand for $400,000. Fire thereupon sent a letter to Royal demanding that Royal tender its policy limits of $250,000 to settle the case for $400,000 and advising Royal that if it failed to do so, Fire would consider such failure to be in bad faith. Plaintiff's attorneys, however, testified that in fact they never offered to settle for $400,000, and that they would not have settled for that amount.

As an alternative, the district court recommended to the parties a "high-low" settlement arrangement under which plaintiffs would receive $65,000 if they lost the suit, and no more than $750,000 if they won. Royal expressed approval of this arrangement. Plaintiffs were unwilling to accept these figures, but suggested $100,000 if they lost and $1,000,000 if they won.

Royal accepted the "high-low" settlement plan because in Steck's opinion the defense had a substantial chance of winning the case. There is substantial evidence that Nordson, the insured, also believed the case should be tried to a conclusion. Ultimately, Royal accepted the "high-low" $1,000,000/$100,000 counter-offer arrangement proposed by the plaintiffs. Fire concurred in this arrangement. Thus, Fire's potential liability became reduced by several strokes of a pen from $5,000,000 to $1,000,000, and if the defense were successful, it would not be required to pay anything. However, Royal obligated itself to pay $100,000 even if the plaintiff lost. Nonetheless, Fire refused to withdraw its bad faith letter to Royal.

The *Nordson* litigation went to trial, and the jury returned a verdict in favor of plaintiffs. Judgment was entered on the verdict against Nordson in the amount of $1,000,000, with Royal required to bear $250,000 and Fire to pay $750,000. Fire thereupon sued Royal for $600,000, the difference between the $150,000 it would have paid had the case been settled for $400,000 and the $750,000 it actually paid. The suit rested on two theories of liability, alleging (1) direct liability to it on the basis of negligence in the settlement negotiations, and (2) that Royal breached a legal duty to Nordson to exercise good faith in the settlement negotiations with the plaintiffs in the underlying action. The jury found in favor of Fire and Royal appeals.

## II.

■ The primary question raised by Royal on appeal is whether a primary carrier is obligated to tender its full policy limits to settle a case based upon a demand only made by the excess carrier in litigation in which both carriers believe there is a substantial probability that their insured will obtain a favorable verdict, and where the plaintiff has made no demand for settlement within primary limits.[1] It is well

---

1. Other issues also pressed by Royal on appeal are: (1) the district court committed fundamental error in its charge to the jury equating bad faith with negligence and confusing the jury as

to the appropriate legal standard to be applied, and (2) the district court erred in submitting an interrogatory to the jury requiring that it find

settled under Pennsylvania law that although there is no absolute duty on the insurer to settle a claim when the judgment against the insured may exceed the amount of the insurance coverage, an insurer is required to "consider in good faith the interest of the insured as a factor in coming to a decision as to whether to settle or litigate a claim against the insured." *Cowden v. Aetna Casualty and Surety Co.*, 389 Pa. 459, 470, 134 A.2d 223, 228 (1957).[2]

Many courts have applied this requirement to the relationship between a primary carrier and an excess carrier through the doctrine of equitable subrogation.[3] *See, e.g., Valentine v. Aetna Insurance Co.*, 564 F.2d 292, 296–97 (9th Cir.1977). No Pennsylvania state court, however, has so extended this duty. Therefore, we must consider, first, whether the Pennsylvania Supreme Court would apply the doctrine of equitable subrogation in the instant case.

■ The basic idea of subrogation is that of substituting the insurance carrier for the insured in the insured's action against a third party. *Anderson v. Borough of Greenville*, 442 Pa. 11, 16, 273 A.2d 512, 514 (1971), *citing Home Owner's Loan Corp. v. Crouse*, 151 Pa.Super. 259, 30 A.2d 330 (1943). "Subrogation is an equitable doctrine and is applicable whenever a debt or obligation is paid from the funds of one person although primarily payable from the funds of another." *Anderson*, 442 Pa. at 16, 273 A.2d at 514.

■ This doctrine is readily applicable to the situation presented by the instant case in which the insured "purchase[d] excess coverage, [effectively substituting] an excess insurer for himself. It follows that the excess insurer should assume the

rights as well as the obligations of the insured in that position." *Centennial Insurance Co. v. Liberty Mutual Insurance Co.*, 62 Ohio St.2d 221, 223, 404 N.E.2d 759, 761 (1980) (quoting *Continental Casualty Co. v. Reserve Insurance Co.*, 307 Minn. 5, 8–9, 238 N.W.2d 862, 864 (1976)). We are convinced and therefore hold that Pennsylvania courts would rule that an excess insurer who has discharged an insured's liability stands in the shoes of the insured and as subrogee may maintain an action for breach of the primary carrier's duty to act in good faith. *See Puritan Insurance Co. v. Canadian Universal Insurance Co.*, 586 F.Supp. 84, 87 (E.D.Pa.1984).

■ Having concluded that Fire may maintain the present action, we must next determine whether Royal breached its duty of good faith. Under Pennsylvania law, the insured must prove bad faith on the part of the primary by "clear and convincing evidence." *Cowden*, 389 Pa. at 472, 134 A.2d at 229; *LaRocca v. State Farm Mutual Automobile Insurance Co.*, 329 F.Supp. 163, 169 (W.D.Pa.1971), *aff'd* 474 F.2d 1338 (3d Cir.1973). Clear and convincing evidence has been defined as follows:

> "[The witnesses'] testimony [must be] so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue...."

*In re Estate of Fickert*, 461 Pa. 653, 658, 337 A.2d 592, 594 (1975) (quoting *La Rocca Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963)). Royal argues on appeal that the trial court should have granted a directed verdict because Fire failed to present clear and convincing evidence that Royal acted in bad faith.

whether Royal acted in good faith, thus impermissibly shifting the burden of proof to Royal.

2. In this suit brought under 28 U.S.C. § 1332, the parties do not dispute that the substantive law of Pennsylvania applies. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

3. Fire strongly urges that this court allow a direct cause of action by the excess carrier

against the primary "thus obviating the need to struggle with the equitable subrogation theory." Supp. brief of appellee at 10. Fire has cited no Pennsylvania cases creating such a direct duty and no plausible legal or policy basis for so doing. We decline to do so in the instant case, without further guidance from the Pennsylvania Supreme Court. *But see Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 586 F.Supp. 84, 88 (E.D.Pa.1984).

■ The Pennsylvania Supreme Court set forth the standard of care owed by an insurer to its insured in the leading case of *Cowden v. Aetna Casualty and Surety Co., supra.* There, the court noted that "[t]he predominant majority rule is that the insurer must accord the interest of its insured the same faithful consideration it gives its own interest." 389 Pa. at 470, 134 A.2d at 228 (citation omitted). The court went on to state that

> Since it is obvious that the interest of one or the other party may be imperiled at the instant of decision, the fairest method of balancing the interests is for the insurer to treat the claim as if it were alone liable for the entire amount. But, that does not mean that the insurer is bound to submerge its own interest in order that the insured's interest may be made paramount. It means that when there is little possibility of a verdict or settlement within the limits of the policy, the decision to expose the insured to personal pecuniary loss must be based on a bona fide belief by the insurer, predicated upon all of the circumstances of the case, that it has a good possibility of winning the suit.... Good faith requires that the chance of a finding of nonliability be real and substantial and that the decision to litigate be made honestly.

*Id.* at 470–71, 134 A.2d at 228.

In *Shearer v. Reed*, 286 Pa.Super. 188, 193–94, 428 A.2d 635, 638 (Pa.Super.1981), the Pennsylvania Superior Court noted that the good faith standard requires more than proof of sincerity; the evaluation of the case by the insurance company must be honest, intelligent and objective.

Royal argues on appeal that there was no evidence that plaintiffs offered to settle for $400,000, and that Royal's refusal to offer that amount may not be considered evidence of bad faith. The question of whether duty of good faith includes a duty to make settlement offers was addressed recently by the district court in *Puritan Insurance Co. v. Canadian Universal Insurance Co.*, 586 F.Supp. 84. In *Puritan,* the district court concluded:

> In the context of an insured suing an insurer for wrongful failure to settle, some courts have stated that an insurer has no duty to solicit or make an offer of settlement and thus cannot be sued for wrongful failure to settle absent a demand for settlement by the injured party. The better view, however, is that the insurer has an affirmative duty to explore settlement possibilties. This court determines that the Pennsylvania courts, if given the opportunity, would rule that in the context of insured versus insurer for wrongful failure to settle a demand by an injured party is not a prerequisite.[4]

586 F.Supp. at 86–87 (citations omitted).

On the other hand, in *LaRocca v. State Farm Mutual Automobile Insurance Co.,* the court stated that

> The event constituting breach of the fiduciary duty to handle settlement negotiations in good faith *is the refusal to accept a settlement offer* which would be reasonably advantageous to the insured in the light of all circumstances known at the time.

*LaRocca,* 329 F.Supp. at 169 (quoting *Gedeon v. State Farm Mutual Automobile Insurance Co.,* 261 F.Supp. 122, 123 (W.D. Pa.1966)), *modified on other grounds,* 386 F.2d 600 (3d Cir.1967) (emphasis added).[5]

---

**4.** In support of its conclusion, the court in *Puritan* noted Rule 238 of the Pennsylvania Rules of Civil Procedure, "which provides for delay damages in a personal injury action where ultimate recovery exceeds 125% of a written settlement offer made by defendant ... enforcing on *defendant* an obligation to engage in settlement negotiations." *Puritan,* 586 F.Supp. at 87, n. 1. The magistrate in the instant case refused to amend the judgment to include delay damages on the ground that Rule 238 applied to personal injury actions only. Although the policy under-

lying the rule is to encourage defendants to make reasonable settlement offers, the existence of the rule has no relevance as to whether an insurer acted in bad faith by failing to make a specified offer. *See also Krupa by Krupa v. Williams,* 316 Pa.Super. 408, 463 A.2d 429, 436–37 (1983).

**5.** As far as we have been able to ascertain, the Pennsylvania appellate courts have never directly addressed this issue, as the court in *Puritan* indicated. However, in *Gedeon v. State Farm*

In the instant case, we find it unnecessary to decide whether Pennsylvania courts would rule that the duty of good faith includes the affirmative duty to explore settlement possibilities because in the instant case Fire failed to present clear and convincing evidence that Royal breached such a duty. Fire contends that Royal was obligated to offer $400,000, the amount the trial judge thought would settle the case. However, in no way can Royal's refusal to offer that amount be said to have contributed to the loss ultimately suffered by Fire, because Royal has proven conclusively through the testimony of Berlinger and Corchin, plaintiff's counsel, that an offer of $400,000 would have been rejected by the plaintiffs. *Cf. Yeomans v. Allstate Insurance Co.*, 130 N.J.Super. 48, 51, 324 A.2d 906, 908 (1974) (citing *Rova Farms Resorts, Inc. v. Investors Insurance Co. of America*, 65 N.J. 474, 496, 323 A.2d 495, 507 (1974)).[6] Moreover, Royal demonstrated throughout the trial a willingness to explore settlement possibilities. It made an initial settlement offer of $75,000–$80,000; it reacted favorably to the court's initial "high-low" proposal, and it ultimately agreed to enter into a written "high-low" $1,000,000/$100,000 arrangement.

Just as it failed to prove that Royal breached an affirmative duty to explore settlement possibilities, Fire also failed to produce clear and convincing evidence that Royal's evaluation of the case was less than honest, intelligent, and objective, or that Royal "failed to accord [Fire's] interest ... the same faithful consideration it [gave] its own interest." *Cowden*, 389 Pa. at 470, 134 A.2d at 228. It should also be noted, as we have previously alluded, that Bechtel had advised his client, Fire, that the defense was going very well and that in his view the defendants had an eighty percent chance of winning.

For proof of its general contention that Royal failed to accord the interest of the insured the same faithful consideration it gave its own interest, Fire relies primarily on fragments of notes taken by Murtha during the trial indicating that he had considered the "high-low" settlement possibilities in terms of the amount Royal stood to lose if plaintiff won. These notes show only that Murtha was understandably concerned with the effect of the "high-low" agreements on Royal; they do not necessarily manifest a bad faith disregard for Fire's interests. The duty of good faith does not mean that the insurer is not to act intelligently and judiciously, or that it "is bound to submerge its own interest in order that the insured's interest may be made paramount." *Cowden*, 389 Pa. at 471, 134 A.2d at 228.[7]

*Mutual Insurance Co.*, 410 Pa. 55, 59, 188 A.2d 320, 322 (1963), and *Gray v. Nationwide Mutual Insurance Co.*, 422 Pa. 500, 504, 223 A.2d 8, 9–10 (1966), the court specifically offered an insurer's unreasonable refusal of an offer of settlement as an example of breach of the good faith obligation.

6. For additional proof that Royal's refusal to offer $400,000 constituted a failure to consider Fire's interests, Fire offers the following exchange between Royal's claims manager, Thomas P. Murtha and Fire's counsel at trial:

Q. If the $5 million in coverage in this matter had been all on the shoulders of Royal Globe, in other words, there had not been an umbrella or an excess carrier, just Royal Globe, and $5 million, and Nordson & Company and $1.5 million in hard damages, would you have still taken the same attitude?
A. Sure. Yes, I would.
Q. You would not have settled that case?
A. That case could not be settled at $400,000. It was never a $400,000 demand. I would have never settled it. I mean, it couldn't have been settled at $400,000.
Q. I am asking you if it could have been settled for $400,000, and the $5 million onus of this coverage was on Royal Globe alone, would you have settled it?
A. If it could have been settled at $400,000, it's a close call. I don't know. I had no confirmation that such a demand existed.
Murtha's responses, given after the verdict rendered in the underlying action and thus with the benefit of hindsight, far from being the "utmost evidence of bad faith," as Fire contends, expressed primarily his consistent belief that the case could not have settled for $400,000. The only uncertainty he expressed is what he would have done if in fact the plaintiffs would have settled for $400,000.

7. Royal also relies on the testimony of Nordson's representatives that Nordson held the position that the case should go to trial, and that Nordson opposed settlement. Fire contends

## III.

Under the circumstances, we conclude as a matter of law that Fire failed to prove by clear and convincing evidence that Royal acted in bad faith. The district court therefore erred in refusing to grant Royal's motions for a directed verdict.[8] The judgment of the district court will be reversed. In the absence of a motion by the defendant for judgment notwithstanding the verdict, the case will be remanded to the district court for further proceedings consistent with this opinion.

that the position of Nordson is a disputed fact. In any event, in a suit against a primary carrier for wrongful failure to settle, the relevance of the insured's position during trial remains unsettled. *Compare Puritan Insurance Co. v. Canadian Universal Insurance Co.,* 586 F.Supp. at 87, *with Jackson v. Saint Paul-Mercury Indemnity Co.,* 339 F.2d 40, 44 (6th Cir.1965). It appears unreasonable, however, to compel a primary carrier to adopt a settlement position which its insured vigorously and reasonably opposes and then have the insured's subrogor's rights rise higher than those of the insured.

8. In light of this conclusion, we find it unnecessary to reach Royal's other contentions on appeal.