J-A29009-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | |
|---|---|
| TIMOTHY A. MOHNEY, | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| Appellant | : |
| | : |
| v. | : |
| | : |
| AMERICAN GENERAL LIFE INSURANCE | : |
| COMPANY, AS SUCCESSOR BY | : |
| MERGER TO AMERICAN GENERAL | : |
| ASSURANCE COMPANY, AS | : |
| SUCCESSOR IN INTEREST TO U.S. | : |
| LIFE CREDIT LIFE INSURANCE | : |
| COMPANY, | : |
| | : |
| Appellee | : No. 2030 WDA 2013 |

Appeal from the Judgment entered December 4, 2013,
Court of Common Pleas, Armstrong County,
Civil Division at No. 1995-0764-Civil

---

| | |
|---|---|
| TIMOTHY A. MOHNEY, | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| Appellee | : |
| | : |
| v. | : |
| | : |
| AMERICAN GENERAL LIFE INSURANCE | : |
| COMPANY, AS SUCCESSOR BY | : |
| MERGER TO AMERICAN GENERAL | : |
| ASSURANCE COMPANY, AS | : |
| SUCCESSOR IN INTEREST TO U.S. | : |
| LIFE CREDIT LIFE INSURANCE | : |
| COMPANY, | : |
| | : |
| Appellants | : No. 2046 WDA 2013 |

Appeal from the Judgment entered December 4, 2013,
Court of Common Pleas, Armstrong County,
Civil Division at No. 1995-0764-Civil

BEFORE: DONOHUE, ALLEN and STRASSBURGER*, JJ.


*Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY DONOHUE, J.:                    **FILED MARCH 20, 2015**

Appellant, Timothy A. Mohney ("Mohney"), appeals from the judgment entered on December 4, 2013 by the Armstrong County Court of Common Pleas, following the trial court's non-jury verdict entered against Mohney on October 18, 2013. Appellee, American General Life Insurance Company ("American General"), as successor-in-interest to U.S. Life Credit Life Insurance Company ("U.S. Life"),[1] cross-appeals from the October 18, 2013 verdict. For the reasons set forth herein, we vacate the judgment and remand the case for a new trial.

In October 1991, Mohney, then a coal miner, purchased disability and life insurance on an automobile loan from U.S. Life. In September 1992, Mohney also purchased disability and life insurance from U.S. Life in connection with a home mortgage. These policies provided, inter alia, for the payment of benefits on these debts in the event that Mohney became totally disabled. The 1991 policy defined "Total Disability" as follows:

> "Total Disability", as used in this Certificate means complete inability of the Insured Debtor to perform any and every duty of his occupation during the initial twelve month period of any disability covered by this Certificate and, thereafter, inability of the Debtor to engage in any occupation for wage, gain or profit for which he is qualified by reason of education, training or experience.

---

[1] Because U.S. Life was the original insurer at the time of the events in question in this case, we will refer to "U.S. Life" herein throughout, although American General is now the appellant in interest.

N.T., 4/16/2013, Exhibit 3. The definition in the 1992 policy differed only slightly, and imparted the same understanding that after the first twelve months, "disability means you are unable to perform any occupation that you are fitted for by means of your education, training or experience." N.T., 4/16/2013, Exhibit 4.

In October 1992, Mohney suffered a back injury in a traffic accident and was unable to continue work as a coal miner. Pursuant to the two insurance policies, U.S. Life began making payments on Mohney's automobile loan and his mortgage. U.S. Life initially sent Mohney monthly continuation claims reports for his doctor to verify his disability, but in or around July 1993 he was placed on automatic status and monthly reports were no longer necessary.

U.S. Life did not contact Mohney again until October 1994, at which time it sent questionnaires to Mohney and Edward Miller, M.D. ("Dr. Miller"), Mohney's treating physician, requesting information about the status of Mohney's current condition and ability to work. In response to the questionnaire directed to him by Lawrence Carroll ("Carroll"), an "Investigative Specialist" in U.S. Life's claims department, Mohney advised that he had been diagnosed with a rheumatic disease called Ankylosing Spondylitis that had worsened his back injury. N.T., 4/16/2013, Exhibit 12. Mohney stated that while he could take care of himself, his ability to walk, drive, bend, and reach were "limited." *Id.* Mohney indicated that he did not

expect to return to work, either part-time or full time, and further advised that he was receiving disability benefits from the Social Security Administration. *Id.*

In Dr. Miller's response to the initial questionnaire, he provided Mohney's medical records, advised that he saw Mohney every six months, and described Mohney's progress as "unchanged." N.T., 4/16/2013, Exhibit 13. Dr. Miller identified Mohney's "current limitations and restrictions" as "no heavy lifting or bending." *Id.* In response to a question asking if he expected "the patient's condition to improve sufficiently in the future for him or her to return to work," Dr. Miller answered "No." *Id.* Regarding his prognosis "for this patient returning to work in this or some other occupation," Dr. Miller wrote "unlikely as a coalminer possibly in a light duty position." *Id.*

On January 19, 1995, Carroll then sent a second questionnaire to Dr. Miller that began as follows:

> Thank you for responding to our medical questionnaire dated 1-5-95 regarding your above named patient.
>
> After reviewing this questionnaire you state that your patients [sic] current restrictions are no heavy lifting or bending. You also stated that he could a light duty position [sic].
>
> Mr. Mahoney [sic] responded to an occupational [sic] and stated that he could walk, drive, bend and reach. He also has 12 years of education and skills in assembly and as a laborer.

N.T., 4/16/2013, Exhibit 14. Carroll then asked Dr. Miller if Mohney could perform the duties of a security guard, automobile salesperson, or an automobile self-service station attendant. *Id.* In his response dated January 26, 1995, Dr. Miller indicated "yes" to each of these jobs, but then qualified his answers with the following statement:

> It is important that the patient be able to sit or stand (alternating) as needed. Some of these jobs require the patient to climb in and out of the car or bend over the hood of the car, etc. which could be problematic. A trial employment should be attempted first on a part time basis before proceeding to full time light duty employment.

*Id.*

On February 7, 1995, Carroll sent Mohney a letter terminating benefits under the two insurance policies. Carroll's letter set forth the definition of total disability under the insurance policies and then stated in relevant part as follows:

> Records obtained from Dr. Edward Miller, your treating physician, indicated your current restrictions were no heavy lifting or bending. He also stated you could perform sedentary or light duty occupations such as a security guard, an automobile salesperson and an automobile self service station attendant.
>
> On an occupational questionnaire you completed, you stated you could walk, drive, bend and reach. You also stated you have 12 years of education and skills in assembly and as a laborer.
>
> Based on all the information and medical records contained in our file, it does not appear that you meet the covered criteria for total disability as stated in your certificates. Although you may not be able to

perform the regular duties of your profession, our information does indicate that you are able to perform the regular duties of an occupation for which you are qualified by education, training or experience. Such occupations you appear to be qualified for, but not limited to, are stated above. Therefore, no additional benefits are payable at this time.

Your account will be paid through March 27, 1995. I trust the above sufficiently explains our position in this matter but if you feel we have not been given the proper understanding, we will be glad to review any additional information you may wish to submit.

*Id.*

On June 23, 1995, Mohney filed a praecipe for a writ of summons, and on June 20, 1997, Mohney filed a complaint alleging causes of action for fraud, breach of contract, violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and bad faith insurance practices. U.S. Life filed preliminary objections, which the trial court granted. On December 1, 1997, Mohney filed an amended complaint adding new breach of contract claims. U.S. Life again filed preliminary objections, which the trial court granted in part. On October 28, 1998, Mohney filed a second amended complaint, to which U.S. Life filed an answer and new matter in the form of a demurrer and a request for attorney's fees. On July 19, 2001, U.S. Life filed a motion for summary judgment, which the trial court granted in part (on the bad faith claim). On July 15, 2003, the day scheduled for trial to begin, the trial court conducted a hearing out of the presence of the jury to determine whether Mohney could present a prima facie case with

regard to his fraud, breach of oral promise, and UTPCPL claims. At the conclusion of the hearing, the trial court entered summary judgment in U.S. Life's favor on all of Mohney's claims except for breach of contract. The trial court also certified the case for immediate appeal pursuant to Rule 341(c) of the Pennsylvania Rules of Appellate Procedure, but on appeal, this Court concluded that no extraordinary circumstances were present to justify an immediate appeal and quashed.

On December 27, 2006, the trial court (hereinafter, the "Breach of Contract Trial Court") issued an opinion and adjudication on the issue of whether Mohney was "totally disabled under the terms of the insurance contract." Breach of Contract Trial Court Order, 6/12/06. The Breach of Contract Trial Court determined that Mohney proved "that he was totally disabled within the meaning of the two insurance policies he purchased from [U.S. Life]." Breach of Contract Trial Court Opinion and Adjudication, 12/27/06, at 10. As a result, the Breach of Contract Trial Court entered judgment against U.S. Life and in favor of Mohney on his breach of contract claim in the amount of $20,772.58. U.S. Life filed a notice of appeal and Mohney filed a notice of cross-appeal.

On appeal, this Court affirmed the trial court's ruling on the breach of contract claim and affirmed the dismissal of the claim under the UTPCPA. This Court reversed the trial court's award of summary judgment to U.S. Life on the bad faith claim, however, concluding as follows:

> Due to its equivocal nature, Dr. Miller's opinion did not establish whether [Mohney] was unable to engage or perform any occupation. Viewed in the proper light, the opinion expressed by Dr. Miller, at best, suggested that [Mohney] **may** be able to perform the three jobs listed by [Carroll] but that such a suggestion should be tested by a trial, part-time employment. Thus, that opinion could not serve as a reasonable basis for denying [Mohney] benefits.

*Mohney v. U.S. Credit Life Ins. Co.*, 917 WDA 2007, 18 (Pa. Super. July 1, 2008) (unpublished memorandum) (emphasis in original).

On remand, the sole question for the trial court (hereinafter, the "Bad Faith Trial Court") was whether U.S. Life had acted in bad faith. On April 12, 2013, Mohney requested leave to file a third amended complaint, which the Bad Faith Trial Court denied. The Bad Faith Trial Court then held a bench trial on April 15-16, 2013. On October 17, 2013, the Bad Faith Trial Court issued its decision, ruling in favor of U.S. Life. In particular, the Bad Faith Trial Court found that U.S. Life's investigation of Mohney's claim "although ultimately leading to an incorrect conclusion, was reasonably thorough and sufficient to provide it with a reasonable basis to find [Mohney] to be not "totally disabled" under the terms of the policy certificates." Bad Faith Trial Court Findings and Adjudication, 10/17/2013, at 21. The Bad Faith Trial Court further found Mohney had presented "no evidence whatsoever showing that U.S. Life willfully or recklessly came to an unreasonable conclusion regarding [Mohney's] benefits. *Id.* at 26.

- 8 -

On December 4, 2013, the Bad Faith Trial Court denied Mohney's post-trial motions for judgment notwithstanding the verdict or for a new trial and entered judgment in favor of U.S. Life. On appeal, Mohney raises the following issues for our consideration and determination:

> 1. Did the Bad Faith Trial Court err by failing to follow this Court's holdings made previously in this case that Dr. Miller's "opinion" was equivocal and could not be reasonably relied upon to terminate the disability benefits?
>
> 2. Did the Bad Faith Trial Court ma[k]e factual findings and conclusions of law inconsistent with and contradictory to those made by the Breach of Contract Trial Court?
>
> 3. Did the Bad Faith Trial Court fail to properly apply the standards for finding bad faith to the conduct of U.S. Life in the investigation of the law and facts applicable to the termination of benefits decision?
>
> 4. Did the Bad Faith Trial Court err by permitting evidence of the insured and his legal counsel's conduct in deciding whether insurance bad faith occurred?
>
> 5. Did the Bad Faith Trial Court err in failing to permit [Mohney] to amend his complaint to include allegations of bad faith litigation misconduct?
>
> 6. Did the Bad Faith Trial Court err in failing to permit [Mohney's] proposed expert from testifying?

Mohney's Brief at 4-5. In its cross appeal, U.S. Life raises a single issue for our review:

> If and only if the [Bad Faith] Trial Court's decisions are reversed and the case is remanded on other grounds, should the [Bad Faith] Trial Court's exclusion of [U.S. Life's] experts be reversed as

> unduly prejudicial to [U.S. Life's] fair defense of the case?

U.S. Life's Brief at 3.

Our standard of review provides:

> Our review in a nonjury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the nonjury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Hollock v. Erie Insurance Exchange*, 842 A.2d 409, 413-14 (Pa. Super. 2004) (en banc) (citations omitted), *appeal denied*, 903 A.2d 1185 (Pa. 2006).

Mohney's first three issues on appeal challenge the Bad Faith Trial Court's determination that U.S. Life did not act in bad faith. Bad faith actions are governed by 42 Pa.C.S.A. § 8371:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

- 10 -

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

This Court has explained that "[a]lthough the bad faith statute does not include a definition of 'bad faith,' the term encompasses a wide variety of objectionable conduct." ***Condio v. Erie Ins. Exchange***, 899 A.2d 1136, 1142 (Pa. Super. 2006), *appeal denied*, 912 A.2d 838 (Pa. 2006).

> For example, bad faith exists where "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." ***O'Donnell v. Allstate Ins. Co.***, 734 A.2d 901, 906 (Pa. Super. 1999) ...; ***see also Terletsky v. Prudential Prop. And Cas. Ins. Co.***, 649 A.2d 680, 688 (Pa. Super. 1994) (bad faith is a frivolous or unfounded refusal to pay the proceeds of a policy done with dishonest purpose, motivated by self-interest or ill will). Bad faith conduct also includes "lack of good faith investigation into facts, and failure to communicate with the claimant." [***Romano v. Nationwide Mut. Fire Ins. Co.***, 646 A.2d 1228, 1232 (Pa. Super. 1994)]; ***see also The Birth Center v. The St. Paul Cos.***, 787 A.2d 376, 378 (Pa. 2001) (upholding a finding of bad faith where the insurer intransigently refused to settle a claim that could have been settled within policy limits, where the insurer lacked a bona fide belief that it had a good possibility of winning at trial, thus resulting in a large damage award at trial); ***O'Donnell***, 734 A.2d at 906 (bad faith "may also extend to the insurer's investigative practices").

\*     \*     \*

> To constitute bad faith, it is not necessary that the insurer's conduct be fraudulent. However, mere negligence or bad judgment is not bad faith. To support a finding of bad faith, the insurer's conduct must be such as to "import a dishonest purpose." In other words, the plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill-will. Bad faith must be shown by clear and convincing evidence.

*Id.* (quoting ***Brown v. Progressive Insurance Co.***, 860 A.2d 493, 497 (Pa. Super. 2004), appeal denied, 872 A.2d 1197 (Pa. 2006)).

To succeed in a bad faith claim, the insured must present clear and convincing evidence to satisfy a two part test: (1) the insurer did not have a reasonable basis for denying benefits under the policy, and (2) the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim."[2] ***O'Donnell***, 734 A.2d at 906. Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured. ***Rhodes v. USAA Cas. Ins. Co.***, 21 A.3d 1253, 1261 (Pa. Super. 2011) (quoting ***Condio***, 899 A.2d at 1143).

With regard to the first prong, the Bad Faith Trial Court concluded that Dr. Miller's responses to the two questionnaires, "taken together with the

---

[2] In ***Nordi v. Keystone Health Plan West Inc.***, 989 A.2d 376, 385 (Pa. Super. 2010), this Court clarified that "the 'motive of self-interest or ill will' level of culpability is not a third element required for a finding for bad faith, but is probative of the second element, i.e., 'the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.'" ***Id.*** at 385 (quoting ***Greene v. United Services Auto. Ass'n***, 936 A.2d 1178, 1190 (Pa. Super. 2007), *appeal denied*, 954 A.2d 577 (Pa. 2008)).

totality of the evidence presented at trial, including the live and very credible testimony of the claims handler, Lawrence Carroll ("Carroll"), could form a reasonable (even if incorrect) basis for discontinuing coverage." Bad Faith Trial Court's 1925(a) Opinion, 2/12/14, at 2. For the reasons that follow, we conclude that the trial court erred in this determination as a matter of law.

After its review of the relevant documents, including Dr. Miller's responses to the two questionnaires, the Breach of Contract Trial Court summarily rejected U.S. Life's contention that it had any basis for terminating Mohney's benefits.

> After a careful review of these documents, the [Breach of Contract Trial Court] is not persuaded that [Mohney] was the least bit less disabled at the time of Dr. Miller's last two reports than he was prior to that time. Dr. Miller's reports indicated that [Mohney's] condition was 'unchanged' and that he 'might' be able to engage in certain light duty work so long as he could observe various limitations relating to heavy lifting, sitting, standing, bending, and climbing in and out of vehicles. This is certainly not the same thing as saying that [Mohney] **was in fact able** to engage in any of these three jobs discussed above, or that "in March, 1995 Timothy Mohney was able to complete all of the tasks normally associated with the job of an automobile salesman, security guard or gas station attendant," as U.S. Life claimed in its trial brief.

Opinion and Adjudication, 12/27/06, at 10 (emphasis in original).

On appeal, this Court agreed with this assessment of Dr. Miller's responses, stating that because of their equivocal nature, Dr. Miller's opinions "did not establish whether [Mohney] was unable to engage or

- 13 -

perform any occupation." **Mohney**, 917 WDA 2007 at 18. To the contrary, we emphasized that Dr. Miller's opinions "at best, suggested that [Mohney] **may** be able to perform the three jobs listed by [Carroll] but that such a suggestion should be tested by a trial, part-time employment." **Id.** (emphasis in original). Accordingly, we ruled that Dr. Miller's responses to U.S. Life's questionnaires "could not serve as a reasonable basis" for denying Mohney benefits. **Id.**

Mohney now contends that the Bad Faith Trial Court violated the law of the case doctrine when it concluded that Dr. Miller's responses to U.S. Life's questionnaires could serve as a reasonable basis for denying Mohney benefits. The law of the case doctrine holds, inter alia, that a lower court should not reopen questions decided by a higher court in an earlier phase of the same case. **See, e.g.**, **Ario v. Reliance Ins. Co.**, 980 A.2d 588, 597 (Pa. 2009); **Commonwealth v. Starr**, 664 A.2d 1326, 1331 (Pa. 1995). The Bad Faith Trial Court disagreed, indicating that it applied a different standard of proof (clear and convincing evidence) than this Court applied in reversing the grant of summary judgment on this issue (evidence in the light most favorable to the non-moving party). Bad Faith Trial Court Findings and Adjudication, 10/17/2013, at 30 n.7.

As a technical matter, we conclude that the law of the case doctrine did not bind the Bad Faith Trial Court on this issue. In determining whether the law of the case doctrine applies, the appellate court "looks to where the

- 14 -

rulings occurred in the context of the procedural posture of the case." *Gerrow v. Shincor Silicones, Inc.*, 756 A.2d 697, 701 (Pa. Super. 2000) (citing *Goldey v. Trustees of the Univ. of Pennsylvania*, 675 A.2d 264, 267 (Pa. 1996)), *aff'd sub nom.*, *Gerrow v. John Royle & Sons*, 813 A.2d 778 (Pa. 2002). The Bad Faith Trial Court based its decision upon the trial record at the April 2013 trial and (as it correctly indicated) on a different standard of review.

Neither of these differences, however, changes our firm conclusion that U.S. Life had **no** reasonable basis to terminate Mohney's benefits. U.S. Life now contends that Carroll reviewed and relied on the contents of Mohney's entire claim file. U.S. Life's Brief at 26. Carroll's testimony at trial, however, evidences that he only relied upon three documents in making his determination: Dr. Miller's responses to the two questionnaires sent to him and Mohney's responses to his questionnaire. N.T., 4/16/13, at 260. Although the claims file contained other documents, including the original claim form from 1992 and continuation reports from 1993, Carroll testified that these documents did not play any significant role in the decision to deny benefits. **Id.** at 222-28 ("when we terminated the benefits, we used the most recent medical information[, ... and] did not consider reports that were two years old."). As such, Carroll's decision to terminate Mohney's benefits was based upon the same documents this Court reviewed in making its determination.

Moreover, regardless of the standard of review, U.S. Life's investigation did not provide any reasonable basis for its decision to terminate benefits to Mohney under the two insurance policies. As this Court previously concluded, **at best** Dr. Miller's responses established that Mohney could attempt, **on a trial basis**, to perform the light duty jobs identified by Carroll. Dr. Miller never advised U.S. Life that Mohney was **actually capable** of performing either of the three identified jobs (security guard, automobile salesman, gas station attendant). As a result, U.S. Life had no reasonable basis to terminate Mohney's benefits on the grounds that he was no longer "totally disabled."

At trial, Carroll did not testify that Mohney was actually capable of performing any of these three jobs. To the contrary, he testified that Dr. Miller's indication that Mohney could **attempt** to perform them was, in and of itself, sufficient to find Mohney not totally disabled:

Q. He's saying attempt to work. So you are saying that attempt on a part-time basis means he's no longer totally disabled?

A. Yes. If he's saying he can work, he can work.

Q. And, a part-time basis or an attempt at a part-time basis is sufficient under your understanding under the terms of the credit disability policy to mean he is no longer totally disabled?

A. From what his doctor says in this statement, that attempt first on a part-time basis before proceeding to a full-time basis, that he is not, after the period of time on this claim that his doctor stated that he is

not total, **our definition**, that is not totally disability.

N.T., 4/16/2013, at 245-46 (emphasis added).

Carroll's reference to "our definition" is striking, since nothing in the definitions of the term "Total Disability" in the two insurance policies provides, or even suggests, that a person is not totally disabled if a doctor signals that the policyholder may "attempt" to work. To the contrary, as set forth hereinabove, the two policies provide that a person is not totally disabled if he can "engage in" or "perform" any occupation for which he is qualified by reason of education, training or experience – and neither definition contains any reference to mere attempts to do so.

In addition, Carroll's understanding of the term "total disability" is fundamentally at odds with prior decisions of Pennsylvania appellate courts interpreting the term. In *Cooper v. Metropolitan Life Insurance Co.*, 177 A. 43 (Pa. 1935), our Supreme Court made clear that a common sense understanding of the term precludes a finding that the person is not totally disabled merely because he can perform basic functions:

> While the words of the policy must receive reasonable construction and, literally interpreted, the words 'total disability' to engage 'in any and every occupation of employment for wage or profit' would require that an insured be a helpless invalid before he would be entitled to benefits under the policy, this cannot be what the parties intended. It is rare that any man is incapacitated from doing some work; many a blind man weaves baskets; a man with both legs and one arm off can sit in a doorway and sell lead pencils, or act as a telegraph operator; but it

cannot well be argued that either is not totally
disabled.

***Id.*** at 44.

Similarly, in ***Bundy v. Nat'l Safety Life Ins. Co.***, 503 A.2d 417 (Pa.

Super. 1985), this Court found that the mere ability to perform "occasional

work" does not preclude a finding of total disability:

> "Total disability" does not mean helplessness or
> complete disability, but it includes more than that
> which is partial. "Permanent disability" means that
> which is continuing as opposed to what is temporary.
> * * * The mere fact that one has done some work
> after the lapse of his policy is not of itself sufficient
> to defeat his claim of total permanent disability. He
> may have worked when really unable and at the risk
> of endangering his health or life. * * * It may be
> assumed that occasional work for short periods by
> one generally disabled by impairment of mind or
> body does not as a matter of law negative total
> permanent disability.

***Id.*** at 422 (quoting ***Lumbra v. United States***, 290 U.S. 551 (1934)).

For these reasons, we conclude that U.S. Life had no reasonable basis

to find that Mohney could engage in or perform the three light duty

occupations identified by U.S. Life in the second questionnaire to Dr. Miller.

The Bad Faith Trial Court's determination to the contrary is not supported by

any competent evidence of record and was error. However, our analysis of

Mohney's bad faith claim cannot end here.

In addition to proving that U.S. Life had no reasonable basis for its

denial of benefits, Mohney also had the burden to establish that U.S. Life

knowingly or recklessly disregarded its lack of a reasonable basis.

*O'Donnell*, 734 A.2d at 906. With regard to this second prong of the bad faith test, the Bad Faith Trial Court determined that "even if the basis for discontinuing benefits was unreasonable, there was no evidence before us indicating that [U.S. Life] acted in knowing or reckless disregard of the fact that the basis for discontinuing coverage was unreasonable." Bad Faith Trial Court's 1925(a) Opinion, 2/12/14, at 2. The Bad Faith Trial Court stated that "[o]ur verdict dismissing [Mohney's] bad faith claim was, and continues to be, based on both of these grounds." *Id.*

We conclude that the Bad Faith Trial Court's finding on this second prong is faulty in part because its erroneous determination that U.S. Life had a reasonable basis for its decision substantially impacted its subsequent ruling that U.S. Life did not knowingly or recklessly disregard its lack of a reasonable basis. The Bad Faith Trial Court recognized that "U.S. Life was required to conduct an investigation sufficiently thorough to provide it with a reasonable foundation for its actions." Bad Faith Trial Court Findings and Adjudication, 10/17/2013, at 21; *see Romano*, 646 A.2d at 1232 (bad faith conduct includes "lack of good faith investigation into facts"). Based upon this standard, the Bad Faith Trial Court thus concluded that U.S. Life's investigation was "reasonably thorough and sufficient" to provide it with the necessary reasonable basis for its termination of Mohney's benefits. *Id.* Since we have now determined, however, that U.S. Life did **not** have a reasonable basis for its actions, the corresponding finding that U.S. Life

conducted a "reasonably thorough and sufficient" investigation is called into serious question.

In this regard, we note that the certified record contains substantial evidence, largely ignored by the Bad Faith Trial Court, that U.S. Life's investigation was not sufficiently thorough to obtain the necessary information regarding Mohney's ability to work. For example, Carroll acknowledged at trial that he made no attempt to contact Dr. Miller to obtain any clarifying information in response to his (at best) equivocal responses to his second questionnaire. N.T., 4/16/2013, at 273. Carroll likewise did not contact the Social Security Administration to inquire regarding its basis for granting disability benefits to Mohney (as reported to Carroll in Mohney's responses to his questionnaire). *Id.* at 275. And Carroll terminated Mohney's benefits without first obtaining an independent medical examination, as permitted under the two insurance policies. *Id.*

The Bad Faith Trial Court's "no evidence" finding is also contradicted by Carroll's misrepresentations of fact in his February 7, 1995 letter to Mohney advising him of the termination of benefits. In his letter, Carroll represented to Mohney that Dr. Miller had "stated you [Mohney] could perform sedentary or light duty occupations such as a security guard, an automobile salesperson and an automobile self service station attendant," even though (as discussed exhaustively hereinabove) Dr. Miller had made no such affirmative representations. N.T., 4/16/2013, Exhibit 16. Carroll

further represented to Mohney that "[o]n an occupational questionnaire you completed, you stated you could walk, drive, bend and reach," even though Mohney had in fact indicated that his ability to perform these functions was "limited." *Id.*; N.T., 4/16/2013, Exhibit 12. These same misrepresentations were contained in the second questionnaire Carroll sent to Dr. Miller, in which he informed the doctor that "You also stated that he could [do] a light duty position," and that Mohney had "stated he could walk, drive, bend and reach." N.T., 4/16/2013, Exhibit 14. We cannot agree with the Bad Faith Trial Court's description of the February 7, 1995 letter as an "adequate and accurate" summary of the information provided by Dr. Miller. Bad Faith Trial Court Findings and Adjudication, 10/17/2013, at 27.

These misrepresentations of fact by Carroll are relevant to whether Carroll (and thus U.S. Life) knowingly or recklessly ignored its lack of a reasonable basis in denying benefits. An insurer has an obligation to communicate with its insured, **Brown**, 860 A.2d at 497, and its investigation must be "honest, intelligent and objective." *See, e.g.*, **Shearer v. Reed**, 428 A.2d 635, 638 (Pa. Super. 1981). Carroll's misrepresentations constitute evidence that his investigation was neither honest nor objective, as it would appear that he focused solely on those parts of the questionnaire answers that supported denial of the claim, while ignoring the important limitations recognized by Dr. Miller and Mohney that supported a contrary decision.

For these reasons, we cannot agree with the Bad Faith Trial Court that there was "no evidence" relevant to the second prong of the bad faith test. At the same time, however, while Carroll's misrepresentations are evidence of bad faith, they do not without more establish knowing or reckless misconduct as a matter of law by clear and convincing evidence on the record before us.

U.S. Life's defense of this bad faith claim has consistently been based on the testimony of its adjuster that his only responsibility in determining the insured's right to disability benefits was to view the medical and other information in the claims file in light of a common sense reading of the definition of total disability in the policy. Thus, this practice is the focal point of the analysis of the second prong of the bad faith test.

In his appellate brief, Mohney does not argue that Carroll's failure to procure additional medical information or the misrepresentations in his April 7, 1995 letter provided the proof necessary to establish the second prong of the bad faith test. Instead, Mohney argues, more indirectly, that Carroll's decision to disregard the important words of limitation in the questionnaire responses was the result of his faulty understanding of the term "total disability" in the insurance policies. According to Mohney, this faulty understanding was in turn the product of Carroll's (and U.S. Life's) knowing or reckless failure to conduct sufficient legal research into the interpretation of "total disability" under Pennsylvania appellate law. Mohney's Brief at 44.

The Bad Faith Trial Court rejected this argument, indicating that while U.S. Life had no standard policy manual, its adjusters (including Carroll) were "trained to read and apply policy terms in accordance with their prior experience and common sense." Bad Faith Trial Court Findings and Adjudication, 10/17/2013, at 23. In this regard,

> [i]f legal questions arose, U.S. Life employed staff attorneys experienced in insurance policy interpretation to provide guidance to its adjusters. Mr. Carroll did not seek legal advice in this case because he did not believe that any additional legal construction of the term "total disability" was necessary. Instead, he applied a plain and common sense meaning to the certificates' definition of "total disability."

*Id.*

As explained hereinabove, the definition of "total disability" that Carroll applied in terminating Mohney's benefits (namely, that he was not totally disabled because Dr. Miller advised that Mohney could attempt a light duty position) was contrary to both the policy definitions of the term and interpretations by Pennsylvania appellate courts. Based upon the Bad Faith Trial Court's own factual findings, it would appear that, in the absence of a standard policy manual or other specific guidance, it was left solely to Carroll's "common sense" to decide whether it was necessary to consult with legal counsel on the proper (legal) interpretation of the policy term at issue. The certified record contains no evidence on industry standards relating to the need to (1) train claims adjusters on legal interpretations of policy

- 23 -

terms, or (2) provide adjusters with guidance as to when they should seek guidance (i.e., legal research) from the available staff attorneys.

In his pre-trial statement, Mohney included an expert report prepared by John W. McCandless ("McCandless"), formerly a claims attorney for Nationwide Mutual Insurance Company. In his expert report, McCandless offered the following opinions regarding the standards of practice in this area:

> It is the responsibility of every insurance company, manager and professional to be informed on the established law which they would be expected to apply in the course of handling claims, specifically including the law regarding the interpretation of policy provisions and definitions. In addition, it is the good faith obligation of every insurer and claims professional to investigate and properly apply that established case law to every coverage determination.

Mohney's Pretrial Statement, 9/24/2012. The certified record also includes the transcript of McCandless' deposition for use at trial, in which he testified regarding his experience with proper claims handling, procedures for review of applicable policy language, and the need for adjusters to be trained in the proper application of established case law on applicable policy terms. Deposition Transcript of John W. McCandless, 4/16/2013, at 9-49.

At trial, the Bad Faith Trial Court, after receiving oral argument from counsel, initially agreed to consider McCandless' deposition testimony. N.T., 4/16/2013, at 16. By order dated October 17, 2013, however, the Bad Faith Trial Court granted U.S. Life's Motion in Limine to Exclude the Reports and

Testimony of John W. McCandless. Bad Faith Trial Court Order, 10/17/2013, at 1. The Bad Faith Trial Court concluded that McCandless' report and testimony consisted of legal conclusions that were improper and inadmissible, the facts underlying Mohney's bad faith claim were "readily ascertainable by the Court without the aid of expert testimony," and McCandless' testimony would not assist in the resolution of Mohney's bad faith claim. *Id.* In his sixth issue on appeal, Mohney contends this decision was in error.

The decision whether a witness is permitted to testify as an expert rests within the sound discretion of the trial court. ***Bergman v. United Servs***. ***Auto. Ass'n***, 742 A.2d 1101, 1105 (Pa. Super. 1999). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Id.* If the facts can be fully and accurately described to the fact-finder, who, without special knowledge or training, is able to estimate the bearing of those facts on the issues in the case, then expert testimony is unnecessary in the search for truth. ***Whyte v. Robinson***, 617 A.2d 380 (Pa. Super. 1992). Whether to permit expert testimony in a bad faith insurance case depends on the complexity of the issues in question. ***Compare Bergman***, 742 A.2d at 1105 (expert testimony not permitted because it "would not contribute anything that had not already been said") ***with Bonenberger v. Nationwide Mut. Ins. Co.***, 791 A.2d 378, 382 (Pa. Super. 2002) ("The trial judge who acted as

factfinder in this matter permitted the admission of this expert to aid the court in its ability to evaluate the bad faith claim.").

In our view, the decision to exclude McCandless' expert report and testimony in this case constituted an abuse of discretion. The issue in question, involving the standards in the insurance industry for the training of claims adjusters in applying legal precedent when deciding insurance claims, is sufficiently complex to permit the introduction of expert testimony. The Bad Faith Trial Court's written decision does not reflect that it had any specific knowledge of the industry standards in this area. Instead, the Bad Faith Trial Court merely accepted Carroll's testimony that there was no need to consult with staff attorneys in this case, and in the absence of expert testimony from McCandless, Mohney had no ability to offer contradictory evidence to rebut Carroll's testimony.

Because we conclude that the Bad Faith Trial Court committed errors in the application of law and abused its discretion in deciding this case, we must vacate the judgment and remand for a new trial. In connection with the new trial, we will address the remaining issues raised by the parties to this appeal.

For his fourth issue on appeal, Mohney contends that the Bad Faith Trial Court erred by considering his post-denial conduct. Mohney's Brief at 52. As a general matter, we agree with Mohney that the analysis of an insurance bad faith claim "is dependent on the conduct of the insurer, not its

insured." **Rhodes**, 21 A.3d at 1261. The Bad Faith Trial Court posits that it committed no error because it "imposed no burden whatsoever on [Mohney] or [Mohney's] counsel to take any action after the discontinuance of coverage." Bad Faith Trial Court's 1925(a) Opinion, 2/12/14, at 3. We do not agree, as the Bad Faith Trial Court specifically noted that neither Mohney nor his counsel provided any additional information in response to Carroll's request that they do so in his February 7, 1995 letter terminating benefits. Bad Faith Trial Court Findings and Adjudication, 10/17/2013, at 28. On remand, evidence of Mohney's post-denial conduct should not be admitted.

For his fifth issue on appeal, Mohney argues that the Bad Faith Trial Court erred by failing to permit him to amend his complaint to include allegations of bad faith litigation misconduct.[3] Mohney's Brief at 54. We take no issue with this decision by the Bad Faith Trial Court, as Mohney did not request leave to amend until one business day prior to the scheduled start of trial. Bad Faith Trial Court's Memorandum and Order, 11/20/13, at 2. A trial court enjoys broad discretion in evaluating a motion for leave to amend pleadings. **See, e.g.**, **Borough of Mifflinburg v. Heim**, 705 A.2d 456, 463 (Pa. Super. 1997), *appeal denied*, 794 A.2d 359 (Pa. 1999).

---

[3] Mohney's proposed amendment identified specific instances of alleged bad faith misconduct by U.S. Life during the pendency of this litigation. We note that Mohney has not raised the more general issue of whether U.S. Life's decision to continue to litigate this claim for many years, despite the absence of any reasonable basis in the record to support its decision to terminate benefits, is itself bad faith. **See generally Berg v. Nationwide Mut. Ins. Co., Inc.**, 44 A.3d 1164 (Pa. Super. 2012), *appeal denied*, 65 A.3d 412 (Pa. 2013).

Based upon its determination that amendment of the pleadings on the eve of trial would be prejudicial to U.S. Life, the Bad Faith Trial Court properly exercised its discretion to deny Mohney's request.

Finally, in its cross-appeal, U.S. Life argues that if this Court remands this case for a new trial, we should reverse the Bad Faith Trial Court's exclusion of its proposed expert witness (Barbara Sciotti) as a sanction for failure to file a pretrial statement in compliance with the pre-trial order. U.S. Life's Brief at 55. In its March 6, 2013 sanctions order, the Bad Faith Trial Court precluded U.S. Life from "introducing at trial any expert testimony or reports." Bad Faith Trial Court Order, 3/6/2013, at 1. In its Rule 1925(a) written opinion, the Bad Faith Trial Court indicates that it did so based upon its conclusion that Mohney "suffered actual prejudice from [U.S. Life's] ongoing failure to provide notice of its experts." Bad Faith Trial Court's 1925(a) Opinion, 2/12/14, at 4.

On appeal, U.S. Life requests relief from these sanctions on the grounds that it "substantially complied" with the pretrial order, that it had a legitimate reason for its delay (its counsel was not informed of the disclosure date), that Mohney was not prejudiced by the delay, and that Mohney's counsel had "ample time to investigate the qualifications of U.S. Life's experts and prepare for their examination." U.S. Life's Brief at 56-57. U.S. Life further indicates that the exclusion of its experts "worked a great

prejudice on U.S. Life," *id.* at 57, though it does not explain the nature of this alleged prejudice.

U.S. Life has not identified any basis in the certified record that would permit this Court to grant the requested relief, as it has not directed us to any evidence to support these unproven contentions. We will leave it to the sound discretion of the Bad Faith Trial Court whether to lift its sanctions and permit the requested expert testimony at the new trial on remand.

Judgment vacated. Case remanded for a new trial. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/20/2015